STATE of Tennessee, Appellee,

v.

Pervis Tyrone PAYNE, Appellant.

Supreme Court of Tennessee,
at Jackson.

April 16, 1990.

Charles W. Burson, Atty. Gen. & Reporter, Norma Crippen Ballard, Asst. Atty. Gen., Nashville, Thomas D. Henderson, Phyllis B. Gardner, Asst. Dist. Attys. Gen., Memphis, for appellee.

W. Mark Ward, Jim Garts, Memphis, for appellant.

## OPINION

FONES, Justice.

Defendant was found guilty of first degree murder of Charisse Christopher and her daughter, Lacie, and guilty of assault with intent to commit murder in the first degree of her son, Nicholas. He was given the death penalty for each of the murders and thirty (30) years for the assault with intent to commit murder offense.

Charisse Christopher was 28 years old, divorced, and lived in Hiwassee Apartments, in Millington, Tennessee, with her two children, three and one-half year old Nicholas and two and one-half year old Lacie. The building in which she lived contained four units, two downstairs and two upstairs. The resident manager, Nancy Wilson, lived in the downstairs unit immediately below the Christophers. Defendant's girlfriend, Bobbie Thomas, lived in the other upstairs unit. The inside entrance doors of the Christopher and Thomas apartments were separated by a narrow hallway. Each of the upstairs apartments had back doors in the kitchen that led to an open porch overlooking the back yard. In the center of the porch was a metal stairway leading to the ground. There was also an inside stairway leading to the ground floor hallway and front entrance to the four-unit building.

Bobbie Thomas had spent the week visiting her mother in Arkansas but was expected to return on Saturday, 27 June 1987, and she and Defendant had planned to spend the weekend together. Prior to 3:00 p.m. on that date, Defendant had visited the Thomas apartment several times and found no one at home. On one visit he left his overnight bag, containing clothing, etc., for his weekend stay, in the hallway, near the entrance to the Thomas apartment. With the bag were three cans of Colt 45 malt liquor.

Nancy Wilson was resting in her apartment when she first heard screaming, yelling and running in the Christopher apartment above her. She heard a door banging open and shut and Charisse screaming, "get out, get out." She said it wasn't as though she was telling the intruder to get out, it was like "children, get out." The commotion began about 3:10 p.m., subsided momentarily, then began again and became "terribly loud, horribly loud." She went to the back door of her apartment, went outside and started to go to the Christopher apartment to investigate, but decided against that, and returned to her apartment and immediately called the police. She testified that she told the police she had heard blood curdling screams from the upstairs apartment and that she could not handle the situation. The dispatcher testified he received her disturbance call at 3:23 p.m. and immediately dispatched a squad car to the Hiwassee Apartments. Mrs. Wilson went to her bathroom after calling the police. The shouting, screaming and running upstairs had stopped, but she

heard footsteps go into the upstairs bath, the faucet turned on and the sound of someone washing up. Then she heard someone walk across the floor to the door of the Christopher apartment, slam the door shut and run down the steps, just as the police arrived.

Officer C.E. Owen, of the Millington Police Department, was the first officer to arrive at the Hiwassee Apartments. He was alone in a squad car when the disturbance call was assigned to Officers Beck and Brawell. Owen was only two minutes away from the Hiwassee Apartments so he decided to back them up. He parked and walked toward the front entrance. As he did so he saw through a large picture window that a black man was standing on the second floor landing of the stairwell. Owen saw him bend over and pick up an object and come down the stairs and out the front door of the building. He was carrying the overnight bag and a pair of tennis shoes. Owen testified that he was wearing a white shirt and dark colored pants and had "blood all over him. It looked like he was sweating blood." Owen assumed that a domestic fight had taken place and that the blood was that of the person he was confronting. Owen asked, "[H]ow are you doing?" Defendant responded, "I'm the complainant." Owen then asked, "What's going on up there?" At that point Defendant struck Owen with the overnight bag, dropped his tennis shoes and started running west on Biloxi Street. Owen pursued him but Defendant outdistanced him and disappeared into another apartment complex.

Owen called for help on his walkie-talkie and Officer Boyd responded. By that time Owen had decided Defendant was not hurt and the blood was not his own—he was running too fast. Owen told Boyd that "there's something wrong at that apartment." They returned to 4516 Biloxi. Nancy Wilson had a master key and let them in the locked Christopher apartment. As soon as the door was opened they saw blood on the walls, floor—everywhere. The three bodies were on the floor of the kitchen. Boyd discovered that the boy was still breathing and called for an ambulance

and reported their findings to the chief of police and the detective division. A Medic Ambulance arrived, quickly confirmed that Charisse and Lacie were dead, and departed with Nicholas. He was taken to Le Bonheur Children's Hospital in Memphis and was on the operating table there from 6:00 p.m. until 1:00 a.m., Sunday, 28 June. In addition to multiple lacerations, several stab wounds had gone completely through his body from front to back. One of those was in the middle of his abdomen. The surgeon, Dr. Sherman Hixson, testified that he had to repair and stop bleeding of the spleen, liver, large intestine, small intestine and the vena cava. During the surgery he was given 1700 cc's of blood by transfusion. Dr. Hixson estimated that his normal total blood volume should have been between 1200 and 1300 cc's. He was in intensive care for a period and had two other operations before he left the hospital, but he survived.

Charisse sustained forty-two (42) knife wounds and forty-two (42) defensive wounds on her arms and hands. The medical examiner testified that the forty-two (42) knife wounds represented forty-one (41) thrusts of the knife, "because there was one perforated wound to her left side that went through her—went through her side. In and out wounds produce two." He said no wound penetrated a very large vessel and the cause of death was bleeding from all of the wounds; there were thirteen (13) wounds "that were very serious and may have by themselves caused death. I can't be sure, but certainly the combination of all the wounds caused death." He testified that death probably occurred within, "maybe 30 minutes, that sort of time period," but that she would have been unconscious within a few minutes after the stabbing had finished.

The medical examiner testified that the cause of death of Lacie Christopher was multiple stab wounds to the chest, abdomen, back and head, a total of nine. One of the wounds cut the aorta and would have been rapidly fatal.

Defendant was located and arrested at a townhouse where a former girlfriend, Shar-

on Nathaniel, lived with her sisters. Defendant had attempted to hide in the Nathaniel attic. When arrested he was wearing nothing but dark pants, no shirt, no shoes. As he descended the stairs from the attic he said to the officers, "Man, I ain't killed no woman." Officer Beck said that at the time of his arrest he had "a wild look about him. His pupils were contracted. He was foaming at the mouth, saliva. He appeared to be very nervous. He was breathing real rapid." A search of his pockets revealed a "pony pack" with white residue in it. A toxicologist testified that the white residue tested positive for cocaine. They also found on his person a B & D syringe wrapper and an orange cap from a hypodermic syringe. There was blood on his pants and on his body and he had three or four scratches across his chest. He was wearing a gold Helbrose wristwatch that had bloodstains on it. The weekend bag that he struck Officer Owen with was found in a dumpster in the area. It contained the bloody white shirt he was wearing when Owen saw him at the Hiwassee Apartments, a blue shirt and other shirts.

It was stipulated that Charisse and Lacie had Type O blood and that Nicholas and Defendant had Type A. A forensic serologist testified that Type O blood was found on Defendant's white shirt, blue shirt, tennis shoes and on the bag. Type A blood was found on the black pants Defendant was wearing when seen by Owen and when arrested. Defendant's baseball cap had a size adjustment strap in the back with a U-type opening to accommodate adjustments. That baseball cap was on Lacie's forearm—her hand and forearm sticking through the opening between the adjustment strap and the cap material. Three Colt 45 beer cans were found on a small table in the living room, two unopened, one opened but not empty, bearing Defendant's fingerprints, and a fourth empty beer can was on the landing outside the apartment door. Defendant was shown to have purchased Colt 45 beer earlier in the day. Defendant's fingerprints were also found on the telephone and counter in the kitchen.

Charisse's body was found on the kitchen floor on her back, her legs fully extended. The right side of her upper body was against the wall, and the outside of her right leg was almost against the back door that opened onto the back porch. Laura Picard was visiting her sister, Helen Truman, who lived in the downstairs apartment across from Nancy Wilson. She was sunbathing in the back yard and heard a noise like a person moaning coming from the Christopher apartment followed by the back door slamming three or four times, "but it didn't want to shut. And this hand, a dark-colored hand with a gold watch, kept trying to shut that back door." It was about that time that Nancy Wilson came out of her back door looking around. Mrs. Picard testified that she knew the manager was looking for the source of the noise and when Mrs. Wilson looked at her she pointed to the Christopher apartment. She said that it was just a few minutes later that the police arrived. She did not have a watch on at the time. She testified that the dark-colored hand she saw three or four times was at a level between the door knob and the bottom of the door.

The medical examiner testified that Charisse was menstruating and a specimen from her vagina tested positive for acid phosphatase. He said that result was consistent with the presence of semen, but not conclusive, absent sperm, and no sperm was found. A used tampon was found on the floor near her knee. The murder weapon, a bloody butcher knife, was found at the feet of Lacie, whose body was also on the kitchen floor near her mother. A kitchen drawer nearby was partially open.

Defendant testified. His defense was that he did not harm any of the Christophers; that he saw a black man descend the inside stairs, race by him and disappear out the front door of the building, as he returned to pick up his bag and beer before proceeding to his friend Sharon Nathaniel's to await the arrival of Bobby Thomas. He said that as the unidentified intruder bounded down the stairs, attired in a white tropical shirt that was longer than his shorts, he dropped change and miscellane-

ous papers on the stairs which Defendant picked up and put in his pocket as he continued up the stairs to the second floor landing to retrieve his bag and beer. When he reached the landing he heard a baby crying and a faint call for help and saw the door was ajar. He said curiosity motivated him to enter the Christopher apartment and after saying he was "coming in" and "eased the door on back," he described what he saw and his first actions as follows:

> I saw the worst thing I ever saw in my life and like my breath just had—had tooken—just took out of me. You know, I didn't know what to do. And I put my hand over my mouth and walked up closer to it. And she was looking at me. She had the knife in her throat with her hand on the knife like she had been trying to get it out and her mouth was just moving but words had faded away. And I didn't know what to do. I was about ready to get sick, about ready to vomit. And so I ran closer—I saw a phone on the wall and I lift and got the phone on the wall. I said don't worry. I said don't worry. I'm going to get help. Don't worry. Don't worry. And I got ready to grab it—the phone but I didn't know no number to call. I didn't know nothing. I didn't know nothing about no number or—I just start trying to twist numbers. I didn't know nothing. And she was watching my movement in the kitchen, like she—I had saw her. It had been almost a year off and on in the back yard because her kids had played with Bobbie's kids. And I have seen her before. She looked at me like I know you, you know. And I didn't know what to do. I couldn't leave her. I couldn't leave her because she needed—she needed help. I was raised up to help and I had to help her.

He described how he pulled the knife out of her neck, almost vomited, then kneeled down by the baby girl, had the feeling she was already dead; said the little boy was on his knees crying, he told him not to cry he was going to get help. His explanation of the blood on his shirt, pants, tennis shoes, body, etc., was that when he pulled the knife out of her neck, "she reached up and grab me and hold me, like she was wanting me to help her ...", that in walking and kneeling on the bloody floor and touching the two babies he got blood all over his clothes. He said he went to the kitchen sink, probably twice, to get water to drink when he thought he was going to vomit, but he denied that he went into the bathroom at any time or used the bathroom lavatory to wash up, as Nancy Wilson testified she heard someone do after the violence subsided.

He was then suddenly motivated to leave and seek help and he described his exit from the apartment as follows:

> And I left. My motivation was going and banging on some doors, just to knock on some doors and tell someone need help, somebody call somebody, call the ambulance, call somebody. And when I—as soon as I left out the door I saw a police car, and some other feeling just went all over me and just panicked, just like, oh, look at this. I'm coming out of here with blood on me and everything. It going to look like I done this crime.

The shoulder strap on the left shoulder of the blue shirt he was wearing while in the victim's apartment was torn, a fact he did not seem to realize and could not remember when it happened. He said he ran because the officer did not seem to believe him. He claimed that he had the Colt 45 beer with him as he ran; that the open can with beer in it spilled into the sack, as he ran from Owen, the bottom of the sack broke, the beer and tennis shoes were scattered along his route. He said that what witnesses had described as scratches were stretch marks from lifting weights.

Defendant presented five character witnesses who testified that Defendant's reputation for truth and veracity was good. Ruth Wakefield Bell testified that she had known Defendant all of his life. She was age 40 and lived in the same block on Biloxi as the Hiwassee Apartments, across the street. She said that on the Saturday afternoon of the murders, Defendant knocked on her door, identified himself and she looked out her bedroom window and

saw him, but she did not let him in—she was upset with her boyfriend and did not want to see or "entertain" anyone. She denied that she was afraid to let him in—or that there was anything unusual about his appearance. She estimated that it was about twenty minutes after he knocked on her door that she saw police cars and an ambulance across the street. Defendant testified that he knocked on her door just before he decided to go to Sharon Nathaniels and went in the Hiwassee Apartments to pick up his bag and beer.

During the cross-examination of Defendant, he was asked and answered as follows:

Q. Can you explain why there's bloodstains on your left leg?

A. Left leg?

Q. Yes, sir.

A. Evidently it probably came—had to come from when she—when she hit the wall. When she reached up and grabbed me.

Q. When she hit the wall?

A. When she—when she hit—when she hit when I got ready to run up—when I got ready to vomit.

Q. When she hit the wall she got blood on you?

A. When she splashed. It was blood—a lot of blood on the floor.

Q. She got blood on you when she hit the wall. Is that what you said?

A. She hit against the wall when she fell back.

Q. Is that what you said, sir, that she got blood on you when she hit the wall?

A. I didn't say she got blood on me when she hit the wall.

Q. Isn't that what you said just a moment ago, sir?

A. That ain't—that's not what I said.

Blood was smeared on the wall of the kitchen next to the back door and on the door itself, from doorknob height to the floor and laterally approximately six or seven feet.

Defendant insists that the evidence is wholly circumstantial and is insufficient to support the verdict.

From the evidence in this case the jury could have found that Defendant was under the influence of cocaine or intoxicated from drinking beer and Geritol, both of which he admitted purchasing and drinking. He was unable to account for the expenditure of $30 to $50 of the sums that he withdrew from the bank on Friday and Saturday morning, and the State's theory was that he spent it for cocaine and used the syringe he purchased to administer it. Defendant and his friend Sylvester Robinson were cruising around the area looking at Playboy magazine containing sexually stimulating pictures and material. By 3:00 p.m. he had visited all the friends and acquaintances he had in the area, waiting for the return of Ms. Thomas, and the jury could have found that he decided to visit her next door neighbor to get a drink of water because he had obtained one earlier in the day from the Truman apartment, downstairs, or to use the telephone, etc. Once inside the evidence justifies the inferences that he made sexual advances, they were resisted and violence erupted. Obviously, Charisse fought her assailant with every ounce of resistance she could muster and tried to get out the back door, but the "dark colored hand" with a gold wrist watch on the arm prevented her from escaping. Her blood was smeared all over that door and the wall next to it. It is safe to conclude that she did not remove the tampon. There was no evidence that anything was missing from the Christopher apartment. So we may also conclude that robbery was not the objective of the murderer's presence.

■ The testimony of Laura Picard and Nancy Wilson, the time of Mrs. Wilson's call to the police and Officer Owens' arrival virtually foreclose the possibility that an unidentified intruder committed these murders and disappeared out the front door before Defendant entered the apartment. Defendant was the person that washed up in the upstairs bathroom, walked out of the apartment, locked the door, and encountered Officer Owen with his bag and beer. He was the person that Owen described as looking like "he was sweating blood."

Also, the jury was justified in rejecting as unbelievable and contrary to human conduct and experience, his alleged efforts to render aid to the Christophers. We find the evidence sufficient to convince any rational trier of fact that Defendant was guilty of murder in the first degree beyond any reasonable doubt, in accord with the standards prescribed in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) and T.R.A.P. 13(e).

■ Next, Defendant insists that the trial judge erred in refusing to suppress evidence of his possession of illegal narcotics and drug paraphernalia, when the State had not complied with the discovery requirements of Tenn.R.Crim.P. 16.

Defendant filed pretrial motions for discovery and inspection and the production of exculpatory evidence. About a week and a half before 8 February 1988, the date of trial, the State learned from the Millington Police Department of the availability of certain physical evidence—the hypodermic syringe wrapper, the paper with the cocaine residue, and the syringe cap taken from Defendant when he was arrested. This evidence had apparently been in the custody of the Millington police since June 1987. The State immediately informed defense counsel of this evidence, which both the State and defense counsel inspected for the first time on 3 February 1988. The next day Defendant moved for suppression of the evidence and on 5 February 1988, the paper with the residue was sent to the University of Tennessee for testing. That same day, after a hearing, the trial court refused to suppress the evidence because of its failure to be produced earlier. At the hearing, defense counsel expressly stated he did not want to run any independent tests.

Although Defendant argues that one could infer from certain omissions by the Millington police that the police were deliberately covering up this evidence because it was mitigating, there is no indication that the State or the police were acting in bad faith or in intentional disregard of the rules of discovery. Where there has been non-compliance with Rule 16, the trial court has

discretion to fashion a remedy based upon the circumstances of the case. *State v. Cadle*, 634 S.W.2d 623, 625 (Tenn.Crim. App.1982). Evidence should not be excluded for non-compliance except when it is shown that Defendant is actually prejudiced by the State's failure and the prejudice cannot otherwise be eradicated. *State v. James*, 688 S.W.2d 463, 466 (Tenn.Crim. App.1984). In light of defense counsel's knowledge of and inspection of the evidence almost a week before trial and his statement that he was ready for trial and did not want a continuance, the trial court's refusal to exclude the evidence for any violation of Rule 16 was not error.

■ Defendant says the evidence of his possession of cocaine and drug paraphernalia was inadmissible proof of other crimes and that its prejudicial effect outweighed its probative value.

Defendant argues that the questioned evidence was not relevant to, and was a crime independent of, the homicide prosecution. On the contrary, the evidence indicating that Defendant was under the influence of cocaine was proof directly related to and explanatory of the circumstances of the murders and relevant to Defendant's mental state during the commission of these offenses. That evidence meets the test prescribed in Rule 401, Federal Rules of Evidence adopted by this Court in *State v. Banks*, 564 S.W.2d 947, 949 (Tenn.1978). Considering the inexplicable brutality with which these crimes were committed it is more probable than not, that the murderer was under the influence of drugs or alcohol or both, and evidence that Defendant had access to both drugs and alcohol was relevant and probative of his guilt. *See State v. Zagorski*, 701 S.W.2d 808, 813 (Tenn. 1985).

■ Defendant complains of the irrelevance of the introduction of a child's toy stuffed animal and a pair of children's shoes found at the crime scene. No objection was made at the time of the admission of those articles as part of the testimony of the investigating detective describing the crime scene. Nevertheless, defendant asks that we consider this issue on its merits.

We have. We find the evidence irrelevant and harmless beyond a reasonable doubt.

All of the remaining issues raised by defendant involve alleged errors that occurred during the sentencing phase of the trial.

At sentencing the State presented only two witnesses, Mary Zvolanek, Charisse's mother and Detective Sammy Wilson of the Millington Police Department. Mrs. Zvolanek testified very briefly about how her grandson, Nicholas, cried for his mother and sister and could not understand what had happened. Detective Wilson was one of two detectives that conducted the investigation of these crimes. He testified at the guilt phase of the trial and was recalled at the sentencing phase to identify a videotape that he had made of the crime scene. He did so and the tape was played for the jury, over objection.

Defendant presented the testimony of four witnesses at the sentencing phase of the trial, his mother and father, Bobbie Thomas, and Dr. John T. Hutson.

Bobbie Thomas testified that she joined Defendant's father's church and became acquainted with Defendant; that she had a troubled marriage, was abused by her husband and it had a bad effect upon her three children; that Defendant was a very caring person and the time and attention he had devoted to her children had "got them back to their old self." She said she did not drink or use drugs and neither did Defendant; that it was inconsistent with Defendant's character to have committed these crimes.

Dr. Hutson is a clinical psychologist, who specializes in criminal court evaluation work. He gave Defendant the Wechsler Adult Intelligence Scale (WAIS) revised version. Defendant's scores were Verbal IQ 78, Performance IQ 82, with a variance of plus or minus 3 on the Verbal and plus or minus 4 on the Performance. He testified that the theoretical norm is 100, that actual test results have moved the norm closer to 110; that historically the mental retardation score was 75, but "retardation" is not commonly used anymore. He preferred mentally handicapped. He also

gave Defendant the Minnesota Multiphasic Personality Inventory (MMPI). That test consists of 566 questions that tests a number of different things, that give insight into personality functioning, responses to stress and physical performance. Various "scales" measure lying or faking, hypochondria, depression, hysteria, psychopathic deviance, sexuality, paranoia, cyclothymia, schizophrenia and mania. The tests are graded by computer. Dr. Hutson testified that Defendant was in a normal range or near normal range, with the exception of intelligence and schizophrenia. He said that Defendant "was actually lower intellectually than I had anticipated. And he is low enough that I consider it significant." He testified that Defendant scored above the normal—which is moving toward psychotic—but that in his opinion Defendant was not psychotic or schizophrenic—that that scale of the MMPI, "has a racial bias to it. Blacks tend to look higher on it when actually its very normal for them." The testing was performed in October, about three months after the murders. Dr. Hutson described Defendant as "somewhat naive" and one of the most polite individuals he had ever interviewed in jail.

Defendant's parents testified that Defendant had no prior criminal record, had never been arrested and had no history of alcohol or drug abuse; that he worked with his father as a painter, was good to children and a good son.

■ Defendant insists that testimony of Nicholas Christopher's grandmother regarding his reaction to the loss of his mother and sister, was inflammatory "victim impact" evidence in violation of *Booth v. Maryland*, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987).

The evidence complained of consisted of Mrs. Zvolanek's answer to one question. The question and answer are as follows:

Q. Ms. Zvolanek, how has the murder of Nicholas's mother and his sister affected him?

A. He cries for his mom. He doesn't seem to understand why she doesn't come home. And he cries for his sister

Lacie. He come to me many times during the week and asks me, Grandmama, do you miss my Lacie. And I tell yes. He says, I'm worried bout my Lacie.

In *Booth v. Maryland, supra,* the Court said that "victim impact statements" provide two types of irrelevant information that create a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner. The first type describes the personal characteristics of the victims and the emotional impact of the crimes on the family. The second type describes the family members opinions and characterizations of the crimes and the defendant. Mrs. Zvolanek's brief answer contains only a matter-of-fact statement that a four-year-old boy misses and cries for his mother and sister. (This case was tried approximately seven months after the crimes were committed). The VIS in *Booth* covered the full range of the two types of irrelevant information described above and was more extensive and inflammatory than the above quoted answer of Nicholas' grandmother. While technically irrelevant, that statement did not create a constitutionally unacceptable risk of an arbitrary imposition of the death penalty, and was harmless beyond a reasonable doubt.

Defendant also contends that comments were made in the State's closing argument that violate *Booth.* Since this case was tried (February 1988) the United States Supreme Court has extended its condemnation of victim impact evidence to comments by the prosecution, in final argument, on personal qualities of the victim, and reading a so-called religious tract, couched in sporting parlance, seeking God's help in playing the game of life as a good sport should, a possession of the victim. As in *Booth,* the majority found that the prosecution had focused upon considerations not relevant to Defendant's "personal responsibility and moral guilt." *South Carolina v. Gathers,* — U.S. —, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989).

■ Defendant's brief quotes from the transcript the portions of the State's closing argument said to violate the Eighth Amendment to the United States Constitution, as follows:

But we do know that Nicholas was alive. And Nicholas was in the same room. Nicholas was still conscious. His eyes were open. He responded to the paramedics. He was able to follow their directions. He was able to hold his intestines in as he was carried to the ambulance. So he knew what happened to his mother and to his baby sister.

Is that heinous ... (XVIII, 1576).

There is nothing you can do to ease the pain of any of the families involved in this case. There is nothing you can do to ease the pain of Bernice or Carl Payne, and that's a tragedy. There is nothing you can do basically to ease the pain of Mr. and Mrs. Zvolanek, and that's a tragedy. They will have to live with it the rest of their lives. There obviously is nothing you can do for Charisse or Lacie Jo. But there is something you can do for Nicholas.

Somewhere down the road Nicholas is going to grow up, hopefully. He's going to want to know what happened. And he is going to know what happened to his baby sister and his mother. He is going to want to know what type of justice was done. He is going to want to know what happened. With your verdict you will provide the answer. (XVIII, 1581)....

You saw the videotape this morning. You saw what Nicholas Christopher will carry in his mind forever. When you talk about cruel, when you talk about atrocious, and when you talk about heinous, that picture will always come into your mind, probably throughout the rest of your lives.... (XVIII, 1591).

... And there won't be anybody there—there won't be his mother there or Nicholas' mother there to kiss him at night. His mother will never kiss him goodnight or pat him as he goes off to bed, or hold him and sing him a lullaby. (XVIII, 1592–1593).

... Mr. Garts wants you to think about a good reputation, people who love the defendant and things about him. He doesn't want you to think about the peo-

ple who love Charisse Christopher, her mother and daddy who loved her. The people who loved little Lacie Jo, the grandparents who are still here. The brother who mourns for her every single day and wants to know where his best little playmate is. He doesn't have anybody to watch cartoons with him, a little one. These are the things that go into why is it especially cruel, heinous, and atrocious, the burden that that child will carry forever. (XVIII, 1594–1595).

... Mr. Garts says but Pervis Payne has lived an exemplary life for twenty years. Well, what about Charisse, for twenty-eight years? What about Lacie Jo, for two years? They lived exemplary lives. But they are not here with us anymore. (XVIII, 1596–1597).

We are of the opinion that the prosecutor's argument is relevant to this defendant's personal responsibility and moral guilt. When a person deliberately picks a butcher knife out of a kitchen drawer and proceeds to stab to death a twenty-eight year old mother, her two and one-half year old daughter and her three and one-half year old son, in the same room, the physical and mental condition of the boy he left for dead is surely relevant in determining his "blameworthiness."

It is an affront to the civilized members of the human race to say that at sentencing in a capital case, a parade of witnesses may praise the background, character and good deeds of Defendant (as was done in this case), without limitation as to relevancy, but nothing may be said that bears upon the character of, or the harm imposed, upon the victims.

This case was tried more than a year before *Gathers* was released but *Griffith v. Kentucky*, 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987) apparently commands that we apply *Gathers* retroactively. However, we are of the opinion that the argument did not violate either *Gathers* or *Booth.*

Finally, we are of the opinion that assuming the argument here violated the Eighth Amendment, as interpreted by the United States Supreme Court, we think it

subject to harmless error analysis. *See State v. Alley,* 776 S.W.2d 506, 513 (Tenn. 1989). The "personal responsibility", the "moral guilt" and the "blameworthiness" of the person who committed these crimes, was established by the proof at the guilt phase, to-wit, that inhuman brutality, without reason or explanation was heaped upon three innocent human beings. Once that person's identity was established by the jury's verdict, the death penalty was the only rational punishment available. Thus, the State's argument was harmless beyond a reasonable doubt.

This issue is without merit.

■ Defendant asserts that the trial judge erred in allowing the State, over objection, to show the jury, at the sentencing, a videotape of the crime scene.

Detective Wilson made a videotape, about ten minutes in length, and the State was permitted to show the jury the first two minutes, approximately, of that tape. The part shown was the scene in the kitchen where Charisse and Lacie's bodies were found, and had not been moved when the video was made. Nicholas, of course, had been taken to the hospital.

Defendant says the video was gruesome and graphic and was "unfairly prejudicial." Defendant asks this Court to apply the test in *State v. Banks,* 564 S.W.2d 947 (Tenn. 1978) to photographs and videos offered at the sentencing stage. Acknowledging that the weighing process where, as here, the State relies upon the aggravating circumstance of heinous, atrocious, or cruel would be different than at the guilt phase—Defendant proposes that we weigh probative value versus prejudicial effect, allow "prejudicial evidence which is relevant" but exclude "unfairly prejudicial" evidence.

The State insists that the video was relevant to the aggravating circumstances, heinous, atrocious, or cruel because it depicts the number and severity of the wounds, the savagery of the attack and the desperate struggle of Charisse to escape the repeated stab wounds.

The video was relevant to the State's contention that the murder was heinous,

atrocious or cruel, and its probative value on that issue outweighed any prejudicial effect. *See State v. Porterfield*, 746 S.W.2d 441 (Tenn.1988) and *State v. Teague*, 645 S.W.2d 392 (Tenn.1983).

■ Defendant contends that the trial judge's instruction to the jurors that they should not "have any sympathy or prejudice or allow anything but the law and evidence to have any influence upon them in determining their verdict," violated his rights under the Eighth Amendment, United States Constitution.

We rejected this issue in *State v. Porterfield*, 746 S.W.2d 441, 450 (Tenn.1988) in reliance upon *California v. Brown*, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987). Jurors are repeatedly told in criminal trials, and were in this trial, that they are to decide the case on the "law and the evidence," without sympathy, prejudice, and similar distractions. The emphasis was not on "anti-sympathy" but on the necessity to key the focus on the law and the evidence. There is no merit to this issue.

■ Defendant contends the prosecution committed error in expressing the personal opinion that "... I could not agree with Tom Henderson more, if this isn't a case for death by electrocution, then I don't know what is...."

It is a violation of the Code of Professional Responsibility, DR 7–106(C)(4) for lawyers engaged in trial to express their personal opinion about any issue involved in the justice of the cause they represent. This Court has repeatedly condemned such conduct. *See e.g. State v. Johnson*, 743 S.W.2d 154, 159 (Tenn.1987) and *State v. Hicks*, 618 S.W.2d 510, 516, 517 (Tenn. Crim.App.1981). However, insofar as its effect upon Defendant's rights, it is ineffective, as well as unprofessional, and in this case was harmless beyond a reasonable doubt.

■ Defendant also complains that the same assistant district attorney committed an inflammatory act during closing argument at the sentencing hearing.

The argument that accompanied the act was as follows:

Ladies and gentlemen of the jury, this is the last thing I am going to say to you. But I want you to think about this when you go back into your jury room. We have heard a lot about Charisse Christopher, Lacie Jo and Nicholas, and here they were as they appeared before Pervis Payne came into their lives. And this is what he did to them.

Did they deserve it? Are you going to let it go unpunished.

As the prosecutor said, "And this is what he did to them," she approached Exhibit 24, a large diagram of Nicholas Christopher's body, and stabbed a hole through it with Exhibit 25, the butcher knife found between Charisse and Lacie's bodies. Defendant contends that the argument and stabbing act was calculated to inflame the passions of the jury. We are of the opinion that it was an improper argument, an improper, unprofessional act and an improper use of exhibits. Whether it was "calculated" to inflame the jury or did in fact inflame the jury is debatable. The jury may also have regarded the action as improper. We find the prosecutor's action harmless beyond a reasonable doubt.

Defendant contends that the trial judge's instructions could have led the jury to believe that they were required to vote for the death penalty unless they unanimously agreed on a mitigating circumstance which outweighed the aggravating circumstances. Defendant relies on *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988) in support of his contention that the instruction violated the Eighth Amendment, United States Constitution. We rejected this contention in *State v. Thompson*, 768 S.W.2d 239 (Tenn.1989).

Defendant contends that the trial judge should have instructed the jury that they must be persuaded beyond a reasonable doubt that the aggravating factors outweigh the mitigating factors and that they must find beyond a reasonable doubt that the death penalty was appropriate in the present case. Defendant says the trial judge's instruction was inadequate in this

case and his Eighth and Fourteenth Amendment rights were violated.

The trial judge instructed the jury that the burden of proof was on the State to prove any statutory aggravating circumstances beyond a reasonable doubt, and gave a definition of reasonable doubt. In *State v. Porterfield, supra,* the same charge was given and we rejected this same issue, advanced by Porterfield.

Defendant contends that the trial judge instructed the jury that *"the sentence shall be death."* Defendant is mistaken, no such charge was given. He has lifted a phrase out of context. We have held that this same charge does not make the death penalty mandatory, as erroneously contended by Defendant. *See e.g. State v. Wright,* 756 S.W.2d 669, 674 (Tenn.1988); *State v. Teague, supra.*

 Defendant contends that the trial judge should have instructed the jury to presume that Defendant would actually serve a life sentence, if the jury verdict was life instead of the death penalty. We have rejected this identical contention in *State v. Melson,* 638 S.W.2d 342 (Tenn. 1982). The after-effect of a jury's deliberation is not a proper instruction for, or consideration, by the jury. *See Houston v. State,* 593 S.W.2d 267, 278 (Tenn.1980).

Defendant contends the Tennessee death penalty statute is unconstitutional, acknowledging that we have repeatedly rejected the same issues he presents. We adhere to our previous opinion holding the statute constitutional.

Defendant contends that the Eighth and Fourteenth Amendments, United States Constitution are violated by Tenn.Code Ann. § 39-2-203(g), which states that if the jury determines that the aggravating circumstance or circumstances proved by the State beyond a reasonable doubt are *not outweighed* by any mitigating circumstances, the sentence *shall* be death.

We addressed this same argument in *State v. Thompson,* 768 S.W.2d 239, 251, 252 (Tenn.1989). We concluded that the statute did not violate the Eighth Amendment.

Defendant cites the recent case of *Adamson v. Ricketts,* 865 F.2d 1011 (9th Cir.1988) in which the Ninth Circuit Court of Appeals held the Arizona death penalty statute unconstitutional because it was said to place the burden on Defendant to prove the existence of mitigating circumstances substantial enough to warrant leniency. The Arizona statute differs from the Tennessee statute and we are content to adhere to our analysis and holding in *State v. Thompson, supra.* Likewise we are not persuaded that the legislature's revision of Tenn.Code Ann. § 39-2-203(g), (now Tenn. Code Ann. § 39-13-203(g)) requires that we depart from *Thompson.*

Pursuant to Tenn.Code Ann. § 39-13-205 we have reviewed the sentence of death and are of the opinion that it was neither excessive nor disproportionate to the penalty imposed in similar cases.

The conviction of murder in the first degree and the sentence of death are affirmed. The sentence of death will be carried out on the 18th day of July, 1990, unless stayed by appropriate authority.

DROWOTA, C.J., and COOPER, HARBISON and O'BRIEN, JJ., concur.