IN THE SUPREME COURT OF TENNESSEE
AT JACKSON
November 6, 2024 Session

## STATE OF TENNESSEE v. PERVIS TYRONE PAYNE

**Appeal by Permission from the Court of Criminal Appeals
Criminal Court for Shelby County
Nos. 87-04408, 87-04409, 87-04410      Paula L. Skahan, Judge**

———————————————————

**No. W2022-00210-SC-R11-CD**

———————————————————

This case is about a court's authority to modify a final criminal judgment. Nearly four decades ago, Pervis Payne received two death sentences for brutally murdering a single mother and her two-year-old daughter. Because of the possibility that the death sentences might be commuted to life sentences in future proceedings, the court aligned the sentences to be served consecutively. Years later—after this Court held that the execution of persons with intellectual disabilities violates the federal and state constitutions, *see Van Tran v. State*, 66 S.W.3d 790, 812 (Tenn. 2001)—the Tennessee legislature established a procedure whereby certain death-sentenced inmates could receive an intellectual disability determination to evaluate the constitutionality of their sentences. Tenn. Code Ann. § 39-13-203(g) (2021). Payne made use of that pathway and was adjudicated intellectually disabled. The trial judge presiding over that adjudication vacated Payne's death sentences and imposed two life sentences in their place. But the court did not stop there: it also revisited the earlier consecutive sentencing determination and ordered that Payne's sentences be served concurrently instead, which would make Payne eligible for parole in 2026. We hold that the trial court lacked jurisdiction to realign Payne's sentences. Once a criminal judgment becomes final, it may not be modified unless a statute or rule authorizes its modification. The trial court had authority to adjudicate Payne intellectually disabled under Tennessee Code Annotated section 39-13-203(g). It also had authority to vacate Payne's death sentences and substitute sentences of life imprisonment under Tennessee Code Annotated section 39-2-205(e) (1982). No statute or rule, however, gave the trial court authority to realign Payne's sentences, so we vacate that part of the trial court's judgment.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Criminal
Appeals Affirmed in Part and Vacated in Part; Remanded to Trial Court**

SARAH K. CAMPBELL, J., delivered the opinion of the Court, in which HOLLY KIRBY, C.J., and JEFFREY S. BIVINS, DWIGHT E. TARWATER, and MARY L. WAGNER, JJ., joined.

Jonathan Skrmetti, Attorney General and Reporter; J. Matthew Rice, Solicitor General; Edwin Alan Groves, Jr., Assistant Attorney General; Amy P. Weirich, District Attorney General; Steve Jones, Assistant District Attorney General, for the appellant, State of Tennessee.

Kelley J. Henry, Chief, Capital Habeas Unit, Federal Public Defender for the Middle District of Tennessee, and Ashley W. Thompson, Research and Writing Attorney, Federal Public Defender for the Middle District of Tennessee, for the appellee, Pervis Tyrone Payne.

Cameron T. Norris, Knoxville, Tennessee, and Gregory Franklin Miller, Seattle, Washington, for the amicus curiae, Gerald Paul Zvolanek.

## OPINION

### I.

Charisse Christopher was a single mother with a three-year-old son, Nicholas, and a two-year-old daughter, Lacie. *State v. Payne*, 791 S.W.2d 10, 11 (Tenn. 1990). She lived in one of the two upstairs apartments in a four-unit building in Millington, Tennessee. *Id.* Pervis Payne's girlfriend, Bobbie Thomas, lived across the hall in the other upstairs unit. *Id.* In June 1987, after an afternoon of drinking and using cocaine while waiting for Thomas to return from a trip, Payne entered Charisse's apartment and stabbed her forty-one times. *Id.* at 11–12. He also repeatedly stabbed Nicholas and Lacie. *Id.* at 12. Neighbors called for help after hearing Charisse's screams. *Id.* at 11. When officers arrived, they discovered blood everywhere and three bodies on the kitchen floor. *Id.* at 12. Charisse and Lacie were already dead. *Id.* But Nicholas, who had several stab wounds that penetrated completely through his body, was still breathing. *Id.* He was rushed to the hospital and into emergency surgery to stop the bleeding and repair his organs, and he ultimately survived. *Id.* Officers encountered Payne, covered in blood, fleeing from the apartment building. *Id.* at 13. When they eventually apprehended him, his "pupils were contracted" and he was "foaming at the mouth." *Id.* Although Payne claimed that an intruder committed the crimes before he entered the apartment to get a drink of water, the evidence "virtually foreclose[d] [that] possibility." *Id.* at 15.

The following year, a Shelby County jury convicted Payne of two counts of first-degree murder and one count of assault with intent to commit first-degree murder. *Id.* at 11. Payne was sentenced to death for each of the two murder convictions and thirty years of imprisonment for the assault conviction. *Id.* The State moved for consecutive sentencing. Payne's counsel argued that the motion for consecutive sentencing was irrelevant given

Payne's death sentences. In response, the State noted the possibility that Payne's death sentences could be commuted to life sentences in future proceedings and argued that, in that case, whether the sentences were to run consecutively or concurrently "would be important." The court agreed and ordered Payne's sentences to run consecutively. This Court affirmed Payne's convictions and sentences on direct appeal. *See id.* at 21.[1] Payne did not challenge the trial court's original consecutive sentencing determination on direct appeal. Nor did he object to that determination in any of the numerous collateral challenges he filed in state and federal court in the ensuing years.[2]

In 2001, this Court held that the execution of persons with intellectual disabilities violates both the United States Constitution and the Tennessee Constitution. *See Van Tran v. State*, 66 S.W.3d 790, 812–13 (Tenn. 2001).[3] The next year, the United States Supreme Court agreed that the federal Constitution prohibits the execution of the intellectually disabled. *See Atkins v. Virginia*, 536 U.S. 304, 320–21 (2002). Because those decisions established a new constitutional rule, they applied retroactively to cases on collateral review. *See Van Tran*, 66 S.W.3d at 811.

Under Tennessee's Post-Conviction Procedure Act, an inmate may seek relief under a new constitutional rule by filing a motion to reopen his first post-conviction petition, but he must do so within one year of the ruling that established the new constitutional rule. Tenn. Code Ann. § 40-30-117(a)(1) (2025). Payne did not file a motion to reopen within one year of our decision in *Van Tran*. *See Payne v. State* (*Payne II*), 493 S.W.3d 478, 491 (Tenn. 2016).

Payne instead waited until 2012 to seek relief based on a claim of intellectual disability. *Id.* at 481. That year, Payne filed a petition for writ of error coram nobis. *Id.*

---

[1] The United States Supreme Court reviewed our decision to consider whether the Eighth Amendment to the United States Constitution categorically prohibits a capital sentencing jury from considering victim impact evidence. The Court held that it does not and affirmed this Court's judgment. *See Payne v. Tennessee*, 501 U.S. 808, 830 (1991).

[2] *See, e.g.*, *Payne v. State,* No. 02C01-9703-CR-00131, 1998 WL 12670, at *21 (Tenn. Crim. App. Jan. 15, 1998) (denying post-conviction and error coram nobis relief), *perm. app. denied*, (Tenn. June 8, 1998); *Payne v. Bell,* 418 F.3d 644, 646 (6th Cir. 2005) (denying federal habeas corpus relief), *cert. denied*, 548 U.S. 908 (2006); *Payne v. State,* No. W2007-01096-CCA-R3-PD, 2007 WL 4258178, at *1 (Tenn. Crim. App. Dec. 5, 2007) (denying motion to compel testing of evidence under the Post-Conviction DNA Analysis Act of 2001), *perm. app. denied*, (Tenn. Apr. 14, 2008).

[3] In 1990, the Tennessee legislature enacted a statute prohibiting defendants with an intellectual disability from being sentenced to death. *See* Act of April 12, 1990, ch. 1038, § 1, 1990 Tenn. Pub. Acts 730 (codified at Tenn. Code Ann. § 39-13-203(b)). But that statute applied only prospectively to defendants sentenced after its effective date. *Van Tran*, 66 S.W.3d at 798.

Payne's petition asserted that he meets the statutory definition of intellectually disabled and asked the court to hold an evidentiary hearing on his claim. *Id.* at 480. The statutory definition of "intellectual disability" that applied at the time required a defendant to show "[s]ignificantly subaverage general intellectual functioning as evidenced by a functional intelligence quotient (I.Q.) of seventy (70) or below." Tenn. Code Ann. § 39-13-203(a)(1) (2010). To support his petition, Payne submitted an affidavit from a Vanderbilt University professor concluding that, although Payne's IQ test scores were above 70, his "functional intelligence clearly is at or below 70." *Payne II*, 493 S.W.3d at 481–82. We held that a petition for a writ of error coram nobis was "not the appropriate procedural mechanism" for Payne's intellectual disability claim because the coram nobis statute provides relief based on newly discovered *facts*, not new legal rules. *Id.* at 485–87.

Payne also sought to reopen his post-conviction petition based on this Court's decision in *Coleman v. State*, 341 S.W.3d 221 (Tenn. 2011), and the United States Supreme Court's decision in *Hall v. Florida*, 572 U.S. 701 (2014). *Payne II*, 493 S.W.3d at 489–92. In *Coleman*, we held that a court may consider competent expert testimony indicating that an IQ test score does not accurately reflect an individual's functional IQ. 341 S.W.3d at 224. In *Hall*, the United States Supreme Court rejected a Florida rule prohibiting an individual with an IQ test score greater than 70 from presenting other proof of intellectual disability. 572 U.S. at 704. The Court held that "when a defendant's IQ test score falls within the test's acknowledged and inherent margin of error, the defendant must be able to present additional evidence of intellectual disability." *Id.* at 702–03.

We held that neither *Coleman* nor *Hall* provided a basis to reopen Payne's post-conviction proceedings. *Payne II*, 493 S.W.3d at 491–92. We had previously held in *Keen v. State* that *Coleman* did not announce a new constitutional rule and therefore did not provide an avenue for an inmate to reopen his post-conviction proceedings. 398 S.W.3d 594, 609 (Tenn. 2012). Payne urged us to overrule *Keen*, but we declined. *Payne II*, 493 S.W.3d at 492. *Hall* was of no help to Payne either. *Hall* did not hold that a defendant in Payne's circumstances is entitled to a *hearing* to determine whether he is intellectually disabled; rather, it concerned only what kind of evidence a defendant could present in a hearing otherwise provided. *Id.* at 490. In any event, *Hall* did not apply retroactively to cases on collateral review. *Id.* at 491.

Although we concluded that Payne was not entitled to relief under the procedural vehicles he had pursued, we encouraged the Tennessee legislature "to consider whether another appropriate procedure should be enacted to enable defendants condemned to death prior to the enactment of the intellectual disability statute to seek a determination of their eligibility to be executed." *Id.* at 492.

- 4 -

In 2021, the legislature established a procedure for inmates like Payne to obtain an intellectual disability determination. *See* Act of April 26, 2021, ch. 399, § 2, 2021 Tenn. Pub. Acts, https://publications.tnsosfiles.com/acts/112/pub/pc0399.pdf (codified at Tenn. Code Ann. § 39-13-203(g)). The statute provides in relevant part:

> A defendant who has been sentenced to the death penalty prior to May 11, 2021, and whose conviction is final on direct review may petition the trial court for a determination of whether the defendant is intellectually disabled. The motion must set forth a colorable claim that the defendant is ineligible for the death penalty due to intellectual disability.

Tenn. Code Ann. § 39-13-203(g)(1) (2021).[4] An intellectual disability determination is available under the statute only if "the issue of whether the defendant has an intellectual disability has [not] been previously adjudicated on the merits." *Id.* § 39-13-203(g)(2).

In 2022, Payne employed this procedure and filed a petition in the Shelby County Criminal Court seeking an adjudication of his intellectual disability status. After obtaining its own expert evaluation of Payne, the State—represented at that time by the District Attorney's office—stipulated that Payne was intellectually disabled and did not contest his petition.

The trial court adjudicated Payne intellectually disabled and vacated his two death sentences. At the time the murders were committed, the only available sentences for first-degree murder were the death penalty or life imprisonment. *See* Tenn. Code Ann. § 39-2-202(b) (1982).[5] So Payne and the State agreed that Payne's two death sentences should be replaced with two life sentences. *See* Tenn. Code Ann. § 39-2-203 (1982). Payne and the State disagreed, however, about the alignment of the sentences. The State argued that the sentences must be served consecutively, in accordance with Payne's original sentencing. Payne contended that the trial court had discretion to impose concurrent sentences instead.

---

[4] The legislature amended subsection -203(g) in 2023 and 2024, but those amendments are not relevant here. *See* Act of April 17, 2023, ch. 182, § 4, 2023 Tenn. Pub. Acts, https://publications.tnsosfiles.com/acts/113/pub/pc0182.pdf (requiring the defendant to serve the Attorney General and providing that the Attorney General "will represent the state"); Act of April 17, 2023, ch. 255, § 1, 2023 Tenn. Pub. Acts, https://publications.tnsosfiles.com/acts/113/pub/pc0255.pdf (adding a subsection concerning the payment of certain costs).

[5] In 1993, the legislature added life imprisonment without the possibility of parole to the list of permissible sentences for first-degree murder. *See* Act of May 19, 1993, ch. 473, § 1, 1993 Tenn. Pub. Acts 824 (codified at Tenn. Code Ann. § 39-13-202(b)).

The trial court concluded that it had the "inherent power" to conduct a full resentencing hearing at which it was free to reexamine whether Payne's life sentences should be served concurrently or consecutively. The court then heard evidence regarding whether Payne should be considered a "dangerous offender" for sentencing purposes. *See* Tenn. Code Ann. § 40-35-115(b)(4) (2019). Based on that evidence, it concluded that Payne's life sentences should be served concurrently, rather than consecutively, because the "threat to society" he posed on release would be "low." With concurrent sentences, Payne would become parole eligible in 2026—thirty years earlier than if the sentences had remained consecutive.

The State appealed, but the Court of Criminal Appeals affirmed. *State v. Payne*, No. W2022-00210-CCA-R3-CD, 2023 WL 5599723, at *11 (Tenn. Crim. App. Aug. 30, 2023). The Court of Criminal Appeals acknowledged that neither section 39-13-203(g) nor any other statute expressly granted the trial court authority to revisit the alignment of a defendant's sentences following a determination under subsection -203(g) that the defendant is intellectually disabled. *Id.* at *10. Nevertheless, the Court of Criminal Appeals held that because "no statutory provision expressly forbids" the trial court from holding a sentencing hearing, the trial court has "discretion to consider the manner of service of multiple first degree murder sentences after vacating the death penalty" under subsection -203(g). *Id.*

The State filed an application for permission to appeal to this Court under Rule 11 of the Tennessee Rules of Appellate Procedure. The application presented a single issue: whether a trial court has jurisdiction to reconsider the consecutive alignment of a defendant's original sentences after a determination of intellectual disability under Tennessee Code Annotated section 39-13-203(g). We granted review.

II.

Jurisdictional determinations are questions of law that we review de novo, with no presumption of correctness. *See, e.g.*, *State v. Allen*, 593 S.W.3d 145, 153 (Tenn. 2020); *State v. Rowland*, 520 S.W.3d 542, 545 (Tenn. 2017). This case also presents questions of statutory interpretation. We review those questions de novo as well. *State v. Cavin*, 671 S.W.3d 520, 525 (Tenn. 2023). When interpreting statutes, we consider "how a reasonable reader, fully competent in the language, would have understood the text at the time it was issued." *State v. Deberry*, 651 S.W.3d 918, 924 (Tenn. 2022) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 33 (2012)). We aim to give a statute's words their "natural and ordinary meaning in the context in which they appear and in light of the statute's general purpose." *Id.* at 925 (quoting *Ellithorpe v. Weismark*, 479 S.W.3d 818, 827 (Tenn. 2015)).

III.

The single question presented for review is whether the trial court had jurisdiction to realign Payne's sentences for his two convictions for first-degree murder. The State argues that it did not. As the State sees it, because Payne's convictions and sentences had long been final by the time he was adjudicated intellectually disabled, the trial court could modify that final judgment only if a statute expressly granted it jurisdiction or authority to do so. As neither section 39-13-203(g) nor any other statute allowed the trial court to revisit the alignment of Payne's sentences, the State argues, the trial court lacked jurisdiction to order that Payne's sentences of life imprisonment be served concurrently. Payne sees things differently. He points out that trial courts ordinarily have broad discretion over sentencing matters. Payne contends that the trial court retained that broad discretion after making his intellectual disability determination because no statute expressly forbade the trial court from holding a sentencing hearing and revisiting sentence alignment.

Our analysis proceeds in two parts. First, we consider whether and how the finality of a criminal judgment affects a trial court's jurisdiction to modify the judgment. Consistent with our precedents, we reaffirm that a trial court has no jurisdiction or authority to modify a final criminal judgment unless a statute or rule grants it such authority. Second, we examine the relevant statutes to determine whether they granted the trial court authority to realign Payne's sentences. We hold that, although the trial court had jurisdiction to adjudicate Payne intellectually disabled and to amend the judgment to sentence Payne to life imprisonment rather than death, it lacked jurisdiction to realign the sentences because no statute gave it authority to revisit that issue.

A.

We begin with finality. Under Tennessee law, "circuit and criminal courts have original jurisdiction of all criminal matters not exclusively conferred by law on some other tribunal." Tenn. Code Ann. § 40-1-108 (2025). A trial court's jurisdiction over a criminal matter ends, however, when the court's judgment becomes final. *See, e.g.*, *State v. Moore*, 814 S.W.2d 381, 382 (Tenn. Crim. App. 1991); *Ray v. State*, 576 S.W.2d 598, 602 (Tenn. Crim. App. 1978). That usually occurs thirty days after the judgment is entered unless a specified post-trial motion is filed. *See State v. Pendergrass*, 937 S.W.2d 834, 837 (Tenn. 1996) (citing Tenn. R. App. P. 4(a), (c)). Once a criminal judgment becomes final and the trial court loses jurisdiction, the court "generally has no power to amend its judgment." *Id.*; *see also Moore*, 814 S.W.2d at 382–83; *Ray*, 576 S.W.2d at 602. Although there are some instances in which a trial court may exercise jurisdiction in a matter that has become final,

"such jurisdiction is limited to that authorized by statute or rule." *Moore*, 814 S.W.2d at 383.

Tennessee's statutory law confirms these principles with respect to the finality of sentences. Tennessee Code Annotated section 40-35-319(b) (2025) provides generally that, "once [a criminal] judgment becomes final in the trial court, the court shall have no jurisdiction or authority to change the sentences in any manner."[6] There are exceptions to this general principle, but they are provided for by statute or rule. *See, e.g.*, Tenn. Code Ann. § 40-35-319(b) (2025) (identifying Tenn. Code Ann. § 40-35-212(d)(1) (2025) and Tenn. R. Crim. P. 35(b) (2025) as exceptions); Tenn. Code Ann. §§ 40-30-101 to -122 (2025) (providing for post-conviction relief when a conviction or sentence is void or voidable based on an abridgement of constitutional rights); Tenn. R. Crim. P. 36 (authorizing the correction of clerical errors in a final judgment); Tenn. R. Crim. P. 36.1 (authorizing the correction of illegal sentences).

The principle of finality reflected in section 40-35-319(b) and our jurisprudence serves important interests. The finality of criminal judgments "is essential to the operation of our criminal justice system." *Teague v. Lane*, 489 U.S. 288, 309 (1989). This is, in part, because an "absence of finality" can frustrate the goals of "deterrence and rehabilitation." *Engle v. Isaac*, 456 U.S. 107, 127 n.32 (1982); *see also Calderon v. Thompson*, 523 U.S. 538, 555 (1998). Deterrence depends on the expectation that "one violating th[e] law will swiftly and certainly become subject to punishment." Paul M. Bator, *Finality in Criminal Law and Federal Habeas Corpus for State Prisoners*, 76 Harv. L. Rev. 441, 452 (1963). And "an endless reopening of convictions, with its continuing underlying implication that perhaps the defendant can escape from corrective sanctions after all," can seriously interfere with the goal of rehabilitation. *Id.*

A lack of finality also harms victims by making it harder for them to obtain closure. The policy of this State, expressed in our Constitution and statutes, is that victims of crime have a "right to . . . a prompt and final conclusion of the case after the conviction or sentence," Tenn. Const. art. I, § 35(6), in the hope that "[a]ll parties affected by a criminal offense, including the victim, survivors of the victim and witnesses to the offense, . . . will be able to return to normal lives as soon as possible," Tenn. Code Ann. § 40-38-105(a) (2025); *see also Clardy v. State*, 691 S.W.3d 390, 406–07 (Tenn. 2024). As the United States Supreme Court has explained, "[o]nly with real finality can the victims of crime

---

[6] The provision currently codified at section 40-35-319(b) was enacted in 1989. *See* Act of May 24, 1989, ch. 591, § 6, 1989 Tenn. Pub. Acts 1169, 1346. But a similar provision was in effect at the time Payne was convicted and sentenced. *See* Tenn. Code Ann. § 40-35-315(b) (1983) ("[O]nce the judgment becomes final in the trial court, such court shall have no jurisdiction or authority to change the sentence in any manner.").

move forward knowing the moral judgment will be carried out." *Calderon*, 523 U.S. at 556.

Given the importance of finality in our criminal justice system, limits on a trial court's jurisdiction to modify final criminal judgments must be heeded. There is no dispute in this case that Payne's convictions and sentences were final when he sought an intellectual disability determination under section 39-13-203(g). Accordingly, the trial court had no jurisdiction to change Payne's sentences in any manner unless a statute or rule granted it that authority. *See, e.g.*, Tenn. Code Ann. § 40-35-319(b); *Pendergrass*, 937 S.W.2d at 837; *Moore*, 814 S.W.2d at 382–83.[7]

B.

Because Payne's sentences were final, the jurisdictional question in this case requires us to examine relevant statutes to determine whether any of them granted the trial court authority to realign Payne's sentences.

The obvious place to start is with section 39-13-203(g), the provision Payne invoked to obtain an adjudication of his intellectual disability status. Subsection -203(g)(1) expressly applies to certain defendants "whose conviction[s are] final on direct review." Although that provision grants trial courts limited jurisdiction to determine whether such a defendant is intellectually disabled, it does not give a trial court authority to do anything else. Significantly, the provision is silent regarding what steps a trial court should take if it determines that a defendant is intellectually disabled and therefore ineligible for the death penalty. Subsection -203(g)(1), standing alone, does not even vest the trial court with jurisdiction to amend the defendant's sentence, let alone hold a new sentencing hearing or revisit sentence alignment.

A different statute, Tennessee Code Annotated section 39-13-206(e) (2022), establishes the procedure to be followed in the event the application of the death penalty "to any individual or circumstance is held to be invalid or unconstitutional so as to

---

[7] At oral argument, Payne argued that the State had waived any argument that the trial court lacked *authority* to realign Payne's sentences because the question presented in its Rule 11 application concerned *jurisdiction*. For purposes of this opinion, we need not decide whether jurisdiction and authority may sometimes be distinct concepts, as other states have. *See, e.g.*, *Porter v. Commonwealth*, 661 S.E.2d 415, 428 (Va. 2008); *Christie v. Rolscreen Co.*, 448 N.W.2d 447, 450 (Iowa 1989). In the post-conviction context, any distinction is immaterial because a court may exercise jurisdiction over a final judgment only when it has been given the authority to do so. *See Edwards v. State*, 269 S.W.3d 915, 920–21 (Tenn. 2008) ("[F]or purposes of [post-conviction] proceedings, the term 'jurisdiction' is synonymous with the term 'authority.'").

permanently preclude a sentence of death as to that individual." That statute provides that the appropriate court "shall, following a sentencing hearing conducted in accordance with § 39-13-207, sentence the person to imprisonment for life without the possibility of parole or, if applicable, imprisonment for life."

Subsection -206(e), however, did not exist in its current form at the time of Payne's offenses. In criminal cases, a defendant generally "must be sentenced pursuant to the statute in effect at the time of the offense."[8] *State v. Smith*, 893 S.W.2d 908, 919 (Tenn. 1994); *see* Tenn. Code Ann. § 39-11-112 (2025). There are exceptions to this presumption against retroactivity, including for procedural statutes. *See, e.g.*, *Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 951 (1997); *Landgraf v. USI Film Prods.*, 511 U.S. 244, 275 (1994). But when the procedural and substantive aspects of a statute are so intimately intertwined that it does not make sense to analyze them separately, the presumption against retroactivity applies to both. *Cf. Willeford v. Klepper*, 597 S.W.3d 454, 466 (Tenn. 2020) (observing that a procedural statute should be treated as "substantive" when it is "intimately intertwined" with a statute's substantive content such that it no longer makes sense to analyze them in distinct terms (quoting *Massey v. David*, 979 So. 2d 931, 937 (Fla. 2008))).

Subsection -206(e) presents one such situation. The availability of sentence modification is so closely related to the penalties for Payne's conduct that they cannot be easily disentangled. Thus, rather than look to subsection -206(e) to determine what authority the trial court had to modify Payne's sentence, we must instead look to the comparable statute that was in effect at the time Payne committed his offenses.

At the time of Payne's offenses, the statute governing the procedure to be followed when a defendant's death penalty became unconstitutional after sentencing was Tennessee Code Annotated section 39-2-205(e). That provision, which had been in effect since 1919, provided a straightforward mechanism for remedying unconstitutional sentences:

> In the event that any provision of §§ 39-2-202 – 39-2-204, 39-2-206 or this section or the application thereof to any individual or circumstance is held to be invalid or unconstitutional by the Tennessee Supreme Court or a federal court, so as permanently to preclude a sentence of death as to that individual, the court having jurisdiction over such individual previously sentenced to

---

[8] Attempting to apply subsection -206(e) to this case illustrates one reason for this rule. Subsection -206(e) is a poor fit for Payne's situation because life imprisonment without the possibility of parole was not an option when Payne was convicted and sentenced. The only two permissible sentences for first-degree murder at that time were death or life imprisonment. Once it was determined that Payne was ineligible for the death penalty, it was clear that Payne must be sentenced to life imprisonment.

death shall cause such individual to be brought before the proper court *which shall sentence such person to imprisonment for life*.

Tenn. Code. Ann. § 39-2-205(e) (1982) (emphasis added). Section 39-2-205(e) established two predicates for sentence modification. First, some "provision of §§ 39-2-202 – 39-2-204, 39-2-206 or [39-2-205] or the application thereof" must be "held . . . invalid or unconstitutional" by this Court or a federal court. *Id.* Second, there must be a judicial determination as to whether the death sentence has been "permanently . . . preclude[d]" with respect to *the specific person requesting relief. Id.*

When this Court decided *Van Tran*, the first predicate to sentence modification under section 39-2-205(e) was satisfied because the death penalty was held unconstitutional as applied to persons who are intellectually disabled. But the second predicate could not be satisfied until a court determined that Payne was intellectually disabled and, therefore, categorically ineligible for the death penalty. By providing a narrow avenue for certain defendants to receive an intellectual disability adjudication, section 39-13-203(g) made it possible for Payne to receive that determination.

At that point, the trial court had the power to "sentence [Payne] to imprisonment for life," in accordance with the text of section 39-2-205(e). What the trial court did not have was the power to alter the consecutive alignment of Payne's sentences, as that authority was neither expressly granted nor necessarily implied by the statutory text. Nowhere in section 39-2-205(e) was there any reference to the alignment of a defendant's multiple sentences or even issues relating generally to manner of service. And it is not necessary to change the consecutive alignment of Payne's sentences to substitute life imprisonment for the death penalty, as the statute requires.

Payne argues that because the alignment of a defendant's sentences is fundamentally a manner-of-service determination, the trial court did not need an independent source of jurisdiction to address it. But that argument views manner-of-service determinations too formalistically. Whether Payne's sentences will be served consecutively or concurrently has consequences for his parole eligibility. By affecting his parole eligibility, his original sentence alignment increased the severity of his punishment. In that way, it was quite unlike other manner-of-service determinations such as the question of what facility should house a prisoner. Thus, even though the alignment of Payne's sentences was not itself a punishment, allowing the issue to be reopened without statutory authority would nevertheless offend the principle of finality underlying section 40-35-319(b).

By going beyond its statutory mandate and reopening the question whether Payne's sentences should be served consecutively or concurrently, the trial court exceeded the limited authority provided by sections 39-13-203(g) and 39-2-205(e). Although the trial

court had the power—indeed, the obligation—to substitute Payne's two death sentences with sentences of life imprisonment after Payne was determined to have an intellectual disability, it did not possess jurisdiction or authority to change the alignment of those sentences.

## CONCLUSION

We affirm the trial court's modification of Payne's two death sentences to sentences of life imprisonment based on section 39-13-203(g) and the statutory scheme in effect at the time the crime occurred. But we vacate the trial court's realignment of Payne's sentences because it lacked jurisdiction to modify the judgment in that respect. We remand to the trial court for further proceedings consistent with this opinion.

_____
SARAH K. CAMPBELL, JUSTICE