IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
October 3, 2007 Session

## PERVIS PAYNE v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. 87-04408     John P. Colton, Judge**

---

**No. W2007-01096-CCA-R3-PD  - Filed December 5, 2007**

---

In 1988, the Petitioner, Pervis Payne, was convicted of two counts of first degree murder and one count of assault with intent to commit first degree murder. For the capital offenses, the jury imposed sentences of death. The trial court imposed a sentence of thirty years confinement for the non-capital conviction. The convictions and sentences were affirmed on direct appeal by the Tennessee Supreme Court. *State v. Payne,* 791 S.W.2d 10 (Tenn. 1990), *aff'd by,* 501 U.S. 808, 111 S. Ct. 2597 (1991). The Petitioner later sought post-conviction relief which pursuit was unsuccessful. *See Pervis Tyrone Payne v. State,* No. 02C01-9703-CR-00131 (Tenn. Crim. App., at Jackson, Jan. 15, 1998), *perm. to appeal denied,* (Tenn. Jun. 8, 1998). On September 7, 2006, the Petitioner filed a motion to compel testing of evidence under the Post-Conviction DNA Analysis Act of 2001. The post-conviction court denied the motion on March 29, 2007. Upon review of the record and the parties' briefs, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed**.

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which THOMAS T. WOODALL and JOHN EVERETT WILLIAMS, JJ., joined.

J. Brook Lathram, Todd Rose, and Daniel Kiel, Memphis, Tennessee, for the appellant, Pervis Payne.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael Moore, Solicitor General; Jennifer L. Smith, Assistant Attorney General; William L. Gibbons, District Attorney General; and John Campbell, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

## Procedural Background

In the last days of June 1987, the lives of twenty-eight-year-old Charisse Christopher and two-and-one-half-year-old Lacie Christopher ended after they were stabbed multiple times with a butcher knife. *See Payne*, 791 S.W.2d at 11-13. During his trial for these murders and for the assault with intent to commit murder of three-and-one-half-year-old Nicholas Christopher, the Petitioner took the stand in his own defense and asserted his innocence. *Id.* at 13-14. A Shelby County jury found the Petitioner guilty of the first degree murders of Charisse and Lacie Christopher and of the assault to commit murder of Nicholas Christopher. As to the murder of Charisse Christopher, the jury found two aggravating circumstances, *i.e.*, the Petitioner knowingly created a great risk of death to two or more persons other than the victim murdered and that the murder was especially heinous, atrocious or cruel. Therefore, the jury sentenced the Petitioner to death for that offense. As to the murder of two and one-half year old Lacie Christopher, the jury found one aggravating circumstance, *i.e.,* the murder was committed against a person less than twelve years of age and the Petitioner was eighteen years of age or older. Thus, the jury sentenced the Petitioner to death for that offense. The trial court imposed a sentence of thirty years for the assault with intent to commit murder conviction. The Petitioner's convictions and sentences were affirmed on direct appeal. *Id.* The United States Supreme Court granted certiorari on the limited issue of the admissibility of victim impact evidence. *See Payne v. Tennessee*, 501 U.S. 808, 111 S. Ct. 2597, *reh'g denied*, 501 U.S. 1277, 112 S. Ct. 28 (1991).

This case has been the subject of extensive appellate review. The Petitioner sought post-conviction relief. The petition for post-conviction was ultimately consolidated with a petition for the issuance of a writ of error coram nobis. The Petitioner was unsuccessful in both collateral attacks. *See Pervis Tyrone Payne v. State*, No. 02C01-9703-CR-00131. The Petitioner sought habeas corpus relief in the United States District Court for the Western District of Tennessee. The district court denied relief. *See Payne v. Bell*, 194 F. Supp. 2d 739 (W.D. Tenn. 2002). On appeal from the district court's ruling, however, the Sixth Circuit Court of Appeals temporarily granted relief by concluding that the use of the heinous, atrocious, or cruel aggravating circumstance instruction violated the Petitioner's Eighth Amendment rights, and the Tennessee state court's rejection of the Petitioner's challenge was contrary to clearly established United States Supreme Court precedent. *Payne v. Bell*, 399 F.3d 768 (6th Cir. 2005). The Respondent, Warden Bell, filed a petition for rehearing for reconsideration in light of the United States Supreme Court's decision in *Bell v. Cone*, 543 U.S. 447, 125 S. Ct. 847 (2005). The Sixth Circuit Court of Appeals granted the petition, *see Payne v. Bell*, 122 Fed. Appx. 844 (6th Cir. 2005), and, upon reconsideration, affirmed the district court's denial of habeas corpus relief.[1] *See Payne v. Bell*, 418 F.3d 644 (6th Cir.

---

[1] The Petitioner later moved for relief under Rule 60, Federal Rules of Civil Procedure. The district court denied the motions on July 16, 2007. An appeal from the district court's order is currently pending in the United States Court of Appeals for the Sixth Circuit. *See Payne v. Bell*, No. 07-5991 (6th Cir.).

(continued...)

2005), *cert. denied*, __U.S.__, 126 S. Ct. 2931 (2006). Thereafter, the State of Tennessee filed a motion in the Tennessee Supreme Court requesting the setting of an execution date. The Tennessee Supreme Court granted the State's motion, setting the execution date for April 11, 2007. Notwithstanding, on February 1, 2007, the Governor of the State of Tennessee issued Executive Order 43, directing the Tennessee Commissioner of Correction to conduct a "comprehensive review of the manner in which death sentences are administered in Tennessee." This executive order further granted a reprieve to death row inmates sentenced to be executed before May 2, 2007. The Petitioner was, therefore, granted a reprieve until May 2, 2007. On May 2, 2007, the Governor allowed the moratorium to expire. The State moved the Tennessee Supreme Court to schedule a new execution date for the Petitioner. The Tennessee Supreme Court granted the motion, setting the execution date for December 12, 2007.

On September 7, 2006, the Petitioner filed a petition requesting post-conviction DNA analysis in the Shelby County Criminal Court. The lower court denied the petition on March 29, 2007. The Petitioner timely filed a notice of appeal document in the trial court. Subsequently, the Petitioner filed a motion to expedite the appeal with this court. This court granted the motion on July 20, 2007.

## Factual Background

On June 27, 1987, the Petitioner visited the apartment of his girlfriend, Bobbie Thomas, several times. However, Ms. Thomas was not at home. On one occasion, the Petitioner left his overnight bag and three cans of Colt 45 malt liquor near the entrance of Ms. Thomas' apartment.[2]

---

[1](...continued)
On September 27, 2007, the Petitioner filed a "Motion to Vacate Execution Date" in the Tennessee Supreme Court. As basis for this motion, the Petitioner relied upon (1) his challenge to Tennessee's lethal injection protocol in the United States District Court for the Middle District of Tennessee (Petitioner's claim is identical to that found meritorious in *Harbison v. Little*, No. 3:06-1206 (Sept. 19, 2007); (2) the Tennessee Supreme Court's order rescheduling Edward Harbison's execution date in light of the ruling of the federal district court; and (3) the United States Supreme Court's grant of certiorari in *Baze v. Rees*, No. 07-5439 (U.S. Sept. 25, 2007) (granting review to determine the constitutionality of Kentucky's three drug lethal injection protocol). On October 22, 2007, the Tennessee Supreme Court declined the Petitioner's invitation to either vacate his execution date or stay the execution pending disposition of federal litigation. *See State v. Pervis T. Payne*, No. M1988-00096-SC-DPE-DD (Tenn., at Nashville, Oct. 22, 2007) *(order)*.

[2] In the direct appeal of this matter, the Tennessee Supreme Court described the apartment complex as follows:

> The building . . . contained four units, two downstairs and two upstairs. The resident manager, Nancy Wilson, lived in the downstairs unit immediately below the Christophers. [The Petitioner's] girlfriend, Bobbie Thomas, lived in the other upstairs unit. The inside entrance doors of the Christopher and Thomas apartments were separated by a narrow hallway. Each of the upstairs

(continued...)

While waiting for Ms. Thomas to return, the Petitioner passed the morning and afternoon by injecting cocaine and drinking beer. Later, he and a friend cruised the area while looking at sexually explicit material.

At about 3:00 p.m., the Petitioner returned to the apartment complex, but instead of going to Ms. Thomas' apartment, he entered the apartment of twenty-eight-year-old Charisse Christopher, who lived in the apartment across the hall from Thomas. The resident manager of the complex, Nancy Wilson, lived in the apartment directly below Charisse Christopher. Around 3:10 p.m., Ms. Wilson heard Charisse Christopher shouting "get out, get out." The noise from the apartment then grew terribly loud. Ms. Wilson telephoned the police after hearing a "blood curdling scream." Ms. Wilson noted that, although the screaming had stopped, she heard footsteps go into the bathroom, followed by the sound of running water.

Within minutes of the police dispatch, an officer arrived at the apartment complex. He observed a black male on the second floor landing pick up an object and come down the stairs. The officer approached the man, who was later identified as the Petitioner. The Petitioner had blood all over him. When questioned by the officer, the Petitioner struck the officer with his overnight bag, dropped his shoes, and started running. The Petitioner was able to elude police and disappear into another apartment complex.

Inside the Christophers' apartment, the police discovered blood on the walls and floor. Ms. Christopher and her two children, three-and-one-half-year-old Nicholas and two-and-one-half-year-old Lacie, were lying on the kitchen floor. Ms. Christopher and Lacie were dead. Nicholas, despite abdominal stab wounds that penetrated his body, was breathing. Ms. Christopher had sustained forty-two direct knife wounds and forty-two defensive wounds. Lacie had received nine stab wounds to the chest, abdomen, back, and head. The murder weapon, a butcher knife, was found at Lacie's feet.

The Petitioner's baseball cap was found on Lacie's forearm. Three cans of Colt 45 malt liquor bearing the Petitioner's fingerprints were found on a small table in the living room. A fourth empty can of malt liquor was found on the landing outside the apartment door. The Petitioner's fingerprints were also found on the telephone and kitchen counter in the Christophers' apartment.

---

[2](...continued)
apartments had back doors in the kitchen that led to an open porch overlooking the back yard. In the center of the porch was a metal stairway leading to the ground. There was also an inside stairway leading to the ground floor hallway and front entrance to the four-unit building.

*Payne*, 791 S.W.2d at 11.

The Petitioner was apprehended later that day hiding in the attic of a former girlfriend. The Petitioner maintained, "Man, I ain't killed no woman." The Petitioner had blood on his body and clothes and several scratches across his chest. His gold watch also had bloodstains on it. It was later determined that the blood types found on the Petitioner's clothing matched the victims' blood types. The Petitioner's overnight bag, recovered in a nearby dumpster, contained a bloody white shirt. A witness, who was sunbathing outside at the time of the murder, testified that she heard moaning from the Christophers' apartment. She also noticed that the back door seemed as if it would not shut. She observed a dark colored hand with a gold watch keep trying to shut the door.

The medical examiner testified that Charisse Christopher was menstruating and a specimen from her vagina tested positive for acid phosphatase. He testified that the result was consistent with the presence of semen but was not conclusive absent sperm, and no sperm was found.

The Petitioner testified in his own defense. He stated that he did not harm any of the Christophers; however, he said that he saw a black man descend the inside stairs, race by him, and disappear out the front door of the building as he returned to pick up his bag and beer. The Petitioner said that when he reached the landing, he heard a baby crying and a faint call for help. He saw that the door of the Christophers' apartment was ajar. He said curiosity motivated him to enter the Christophers' apartment. After saying he was "coming in," he "eased the door on back." He described what he saw and his first actions as follows:

> I saw the worst thing I ever saw in my life and like my breath just had-had tooken[sic] - just took out of me. You know, I didn't know what to do. And I put my hand over my mouth and walked up closer to it. And she was looking at me. She had the knife in her throat with her hand on the knife like she had been trying to get it out and her mouth was just moving but words had faded away. And I didn't know what to do. I was about ready to get sick, about ready to vomit. And so I ran closer - I saw a phone on the wall and I lift and got the phone on the wall. I said don't worry. I said don't worry. I'm going to get help. Don't worry. Don't worry. And I got ready to grab it - the phone but I didn't know no number to call. I didn't know nothing. I didn't know nothing about no numper or - I just start trying to twist numbers. I didn't know nothing. And she was watching my movement in the kitchen, like she - I had saw her. It had been almost a year off and on in the back yard because her kids had played with Bobbie's kids. And I have seen her before. She looked at me like I know you, you know. And I didn't know what to do. I couldn't leave her. I couldn't leave her because she needed - she needed help. I was raised up to help and I had to help her.

The Petitioner described how he pulled the knife out of Ms. Christopher's neck and almost vomited. Then he kneeled down by the baby girl and had the feeling she was already dead. The Petitioner said that the little boy was on his knees crying, and he told him not to cry because the Petitioner was going to get help. The Petitioner's explanation of the blood on his shirt, pants, tennis shoes, body, etc., was that when he pulled the knife out of Ms. Christopher's neck, "she reached up and grab me and hold me, like she was wanting me to help her . . . ." Additionally, the petitioner explained that in walking and kneeling on the bloody floor and touching the two babies, he got blood all over his clothes. He said he went to the kitchen sink, probably twice, to get water to drink when he thought he was going to vomit, but he denied that he went into the bathroom at any time or used the bathroom lavatory to wash up, as Nancy Wilson testified she heard someone do after the violence subsided.

The petitioner claimed that he was then suddenly motivated to leave and seek help. He described his exit from the apartment as follows:

> And I left. My motivation was going and banging on some doors, just to knock on some doors and tell someone need help, somebody call somebody, call the ambulance, call somebody. And when I - as soon as I left out the door I saw a police car, and some other feeling just went all over me and just panicked, just like, oh, look at this. I'm coming out of here with blood on me and everything. It going to look like I done this crime.

The shoulder strap on the left shoulder of the blue shirt he was wearing while in the victim's apartment was torn, a fact he did not seem to realize and could not remember happening. He said he ran because the officer did not seem to believe him. He claimed that he had the Colt 45 malt liquor with him as he ran. The Petitioner claimed that the malt liquor in the open can spilled into the sack, the bottom of the sack broke, and the malt liquor and tennis shoes were scattered along his route. He said that what witnesses had described as scratches were stretch marks from lifting weights.

## I. The Petitioner's Request

On September 7, 2006, the Petitioner filed, pursuant to Tennessee Code Annotated section 40-30-301, *et seq.*, a petition for DNA analysis in the Shelby County Criminal Court. In his petition, the Petitioner requested testing of:

> 1. The bloody clothing the Petitioner was wearing at the time of his arrest;

2.  The bloody shirt found in the Petitioner's discarded overnight bag;

3.  The bloody clothing worn by the victims; and

4.  The vaginal swabs taken from Charisse Christopher.

The Petitioner has consistently maintained his innocence.  Specifically, he argued that another individual preceded him in the Christophers' apartment.  The Petitioner stated that DNA testing on these items has the potential to corroborate his claim of innocence.  He further maintained that a reasonable probability exists that he would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis.  Specifically, the Petitioner argued that exculpatory results could include (1) the presence of third party DNA on the various items of bloody clothing; (2) the absence of the Petitioner's DNA on the vaginal swabs of Charisse Christopher; (3) the presence of third party DNA on the vaginal swabs taken from Charisse Christopher; and (4) the presence of the same third party's DNA on both the various items of bloody clothing and the vaginal swabs from Charisse Christopher.  The Petitioner also contends that the evidence sought to be tested was still in existence and was in such condition that DNA analysis may be conducted.  Finally, the Petitioner asserted that the evidence had never been subjected to DNA analysis.

On December 15, 2006, the State of Tennessee filed a response to the Petitioner's request for DNA testing.  The State claimed that the Petitioner could not establish that a reasonable probability exists that the Petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis.  Specifically, the State asserted that the Petitioner was never charged with raping the victim, nor did the jury find that the Petitioner raped the victim.  The State claimed that any DNA results would not have resulted in the Petitioner not being charged nor would it have changed the result of the trial.  The State further asserted that the Petitioner's motive in filing the petition was merely an attempt to delay his execution.

**II.  Post-Conviction Court's Ruling**

On February 1, 2007, the lower court permitted argument by both parties on the petition for post-conviction DNA testing.  At the hearing, the State indicated that the vaginal swab evidence was no longer in existence. Specifically, the State asserted that:

> [t]he swabs that were tested and got a reaction for acid phosphastase would have been consumed by the test.  If anything else, a rape kit or any similar type of evidence that was obtained by

7

the Medical Examiner, would have been held at UT, and I found out through the last case I handled with Sedley Alley that that evidence was destroyed when the freezer that they were in broke in 1990, and it was a couple of days before people realized that it wasn't working, and by that time, the samples had spoiled and they were discarded, so anything before 1990 was lost when the freezer broke, and those items would not have been kept at the Clerk's Office, and had they been, they probably would have not been able to have survived all those numbers of years just thrown in an unrefrigerated property room.

On March 29, 2007, the post-conviction court entered its order denying post-conviction DNA testing. The court determined that the Petitioner failed to demonstrate that a reasonable probability exists that, had evidence of a third party's DNA been found on the victim's clothing or on the vaginal swabs taken from Charisse Christopher, he would not have been prosecuted or convicted of the murders. Specifically, the post-conviction court made the following observations, summarized as follows:

1. The Petitioner claims that evidence of a third party's DNA or the absence of the Petitioner's DNA from the clothing of the victims would corroborate his claim of innocence. The post-conviction court concluded that "the presence of skin, hair or some other substance containing DNA, other than blood, even if it were found to belong to an unknown third party would not prove exculpatory as such sample could have been left at the apartment at a time prior to the murders." While the presence of third party blood DNA revealed on the clothing would present a stronger claim, there is no reasonable probability that the presence of third party blood DNA would have led to a different result. In so concluding, the post-conviction court relied heavily upon the conclusions of this court and the Tennessee Supreme Court that the evidence presented at trial precluded any other person from committing these crimes other than the Petitioner.

2. The post-conviction court noted that the proof at trial revealed that the Petitioner had scratches on his chest. Notwithstanding, there was no proof that these injuries were so severe that they would have necessarily left blood evidence on the victims' clothing. The fact that the Petitioner did not leave his own blood at the scene does not exonerate him nor does this fact corroborate his testimony that he was not the perpetrator.

3. The post-conviction court agreed with the State that the vaginal swabs were no longer in existence or available for testing. Notwithstanding, the post-conviction court also determined that, even if DNA testing revealed the presence of third-party DNA on the vaginal swabs, this would not provide a reasonable probability that the Petitioner would not have been prosecuted or that he would not have been convicted. The post-conviction court cited to the fact that the jury specifically rejected the aggravating factor that the murder was committed during the perpetration of the rape. Moreover, the medical proof presented at trial was inconclusive as to whether sexual intercourse had occurred; if it did, when it occurred; or whether the sexual encounter was consensual. The post-conviction court noted that the presence of third-party DNA on the vaginal swabs would also fail to exonerate the Petitioner.

4. The bloody clothing is still in the State's possession and has not previously been subjected to testing. The post-conviction court agreed with the State's contention that the ability to test the clothing was questionable considering the "level of blood saturation."

The post-conviction court concluded that

. . . this court does not find that DNA testing is warranted under Tenn. Code Ann. § 40-30-305. It is this court's understanding that a request for DNA testing under this section, unlike a request for testing under Tenn. Code Ann. § 40-30-304, is discretionary. . . . Regardless, this court also finds that, petitioner has failed to demonstrate that a reasonable probability exists that analysis of the evidence will produce DNA results which would have rendered the petitioner's verdict or sentence more favorable if the results had been available at the proceeding leading to his judgment of conviction. Given the strength of the State's proof at trial and the damning nature of petitioner's own trial testimony, this court finds it unlikely the jury would have returned a verdict finding the petitioner guilty of an offense lesser than that for which he was convicted, even if DNA analysis of the bloody clothing or vaginal swabs had produced favorable results. Finally, despite the petitioner's argument to the contrary, given the brutal nature of the offense, it is not likely that the jury would have rendered a sentence less than death, even if they had heard evidence of DNA analysis favorable to petitioner. This is particularly true with regard to the

9

vaginal swabs, since the jury specifically rejected the aggravating circumstances premised upon this proof.

. . . .

This court finds petitioner failed to demonstrate that a reasonable probability exists that he would not have been prosecuted or convicted or that he would have received a more favorable verdict or sentence, if exculpatory DNA evidence had been obtained through the requested testing. Moreover, with regard to the vaginal swabs and bloody clothing of the victims, petitioner failed to demonstrate such items are either still in existence; or, if still in existence, are in a condition suitable for testing. Thus, the Petition for Post-Conviction DNA Analysis is hereby, DENIED.

## III. The Act

The Post-Conviction DNA Analysis Act of 2001 provides that a person convicted of certain enumerated crimes, including first degree murder, may, at any time, file a petition requesting forensic DNA analysis of any evidence (1) in the possession or control of the prosecution, law enforcement, laboratory, or court, and (2) that is related to the investigation or prosecution that resulted in the judgment of conviction and that may contain biological evidence. T.C.A. § 40-30-303. The Act provides no statutory time limit and gives petitioners the opportunity to request analysis at "any time," whether or not such a request was made at trial. *Griffin v. State*, 182 S.W.3d 795, 799 (Tenn. 2006). A post-conviction court is obligated to order DNA analysis when the petitioner has met each of the following four conditions:

(1) A reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis;

(2) The evidence is still in existence and in such condition that DNA analysis may be conducted;

(3) The evidence was never previously subjected to DNA analysis or was not subjected to the analysis that is now requested which could resolve an issue not resolved by previous analysis; and

10

(4)     The application for analysis is made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice.

T.C.A. § 40-30-304; *see also Griffin*, 182 S.W.3d at 798.  Additionally, if DNA analysis would have produced a more favorable verdict or sentence if the results had been available at the proceedings leading up to the conviction or sentence, then the post-conviction court may order DNA analysis when the petitioner meets the conditions of Tennessee Code Annotated section 40-30-305; *see also* Griffin, 182 S.W.3d at 798.  In either instance, some physical evidence must be available and in a proper condition to enable a DNA analysis.  T.C.A. § 40-30-304(2); § 40-30-305(2).

"If the state contests the presence of any qualifying criteria and it is apparent that each prerequisite cannot be established, the [post-conviction] court has the authority to dismiss the petition."  *Marcus Nixon v. State*, No. W2005-02158-CCA-R3-WM (Tenn. Crim. App., at Jackson, Apr. 3, 2006) (quoting *William D. Buford v. State*, No. M2002-02180-CCA-R3-PC (Tenn. Crim. App., at Nashville, Apr. 24, 2003), *perm. to appeal denied,* (Tenn., 2003)).  That is, a petitioner's failure to meet any of the qualifying criteria is fatal to the action.  *William D. Buford v. State*, No. M2002-02180-CCA-R3-PC.

The post-conviction court is afforded considerable discretion in determining whether to grant a petitioner relief under the Act, and the scope of appellate review is limited.  *See Sedley Alley v. State*, No. W2004-01204-CCA-R3-PD (Tenn. Crim. App., at Jackson, May 26, 2004), *perm. to appeal denied*, (Tenn., Oct. 4, 2004), *cert. denied*, 544 U.S. 950, 125 S. Ct. 1695 (2005) (citing *Jack Jay Shuttle v. State*, No. E2003-00131-CCA-R3-PC (Tenn. Crim. App., at Knoxville, Dec. 16, 2003), *perm. to appeal denied*, (Tenn. Apr. 2, 2004) (citation omitted)). In making its decision, the post-conviction court must consider all the available evidence, including the evidence presented at trial, and any stipulations of fact made by either party.  *Id.*  The post-conviction court may also consider the opinions of this court and the Tennessee Supreme Court on direct appeal of the petitioner's convictions or the appeals of the petitioner's prior post-conviction or habeas corpus actions.  *Id.*  On appellate review, this court will not reverse unless the judgment of the post-conviction court is not supported by substantial evidence.  *Id.* (citing *Willie Tom Ensley v. State*, No. M2002-01609-CCA-R3-PC (Tenn. Crim. App., at Nashville, Apr. 11, 2003)).

## IV.  Satisfying the Statutory Criteria

### A.  Motivation of Bringing Petition

The post-conviction court questioned the Petitioner's motivations in raising the present petition at this late time. Specifically, the court acknowledged that the items now sought to be tested have been available since before the Petitioner's trial. Indeed, although the Post-Conviction DNA Analysis Act was enacted in 2001, it was not until five years later that the Petitioner made his first request for testing. Counsel for Petitioner maintained that he was unaware of the right to seek DNA analysis until shortly before the present petition was filed. Notwithstanding its stated concerns, the post-conviction court accepted counsel's assertions and found that the Petitioner had satisfied this requirement of the statute. We adopt the conclusions of the lower court on this matter.

## B. Existence of Evidence and Prior Testing of Evidence

### 1. Vaginal Swabs

The State asserted that "at least a portion of the evidence in question is currently not in the possession of the State, and, although it has not previously been subjected to DNA analysis, likely does not still exist due to a malfunction of a storage facility at the . . . lab. . . . Thus, the vaginal swabs taken from Ms. Christopher are no longer available." No argument has been submitted contradicting the findings of the post-conviction court. Accordingly, we adopt its conclusion that the vaginal swabs taken from Charisse Christopher are no longer in existence.[3]

### 2. Bloody Clothing

The post-conviction court determined that the items of bloody clothing remain in the State's possession and were not previously subjected to testing. The post-conviction court shared the State's concern regarding the viability of testing these items. Specifically, the court took into account the circumstances of the crime scene, *i.e.*, the excessive amounts of the victims' blood that saturated the clothing and surrounding areas. The court commented that "it is not clear . . .that, after twenty years, any meaningful testing could be done to determine if blood other than the victims', either individually or collectively, is contained on any one article of clothing and the petitioner has failed to present any scientific testimony or proof that such testing could be accomplished." Accordingly, the post-conviction court determined that the Petitioner had failed to establish that testing was able to be accomplished on the victims' clothing. Notwithstanding, the court noted that "it may be more likely that blood samples could be sufficiently isolated on the petitioner's bloody clothing to allow for meaningful testing."

---

[3]On appeal, the Petitioner does not contest the post-conviction court's ruling regarding the existence of the vaginal swabs. Notwithstanding, he reserves the right to revive the petition regarding the vaginal swabs should he discover evidence to refute the post-conviction court's findings.

This court agrees with the Petitioner that there is not substantial evidence supporting the post-conviction court's conclusion that the victims' clothing could not be tested due to the high level of blood saturation. We conclude that the Petitioner has established that the samples sought to be tested, *i.e.,* the victim's clothing and the Petitioner's clothing, are still in existence and have never been previously been subjected to DNA analysis. Accordingly, the Petitioner satisfies prongs two and three of the statutory criteria.

### C. Reasonable Probability of Different Result

The Post-Conviction DNA Analysis Act was created because of the possibility that a person has been wrongfully convicted or sentenced. *Jack Jay Shuttle v. State*, No. E2003-00131-CCA-R3-PC (citation omitted). In this regard, the post-conviction court is to assume that the "DNA analysis will reveal exculpatory results in the court's determination as to whether to order DNA testing." *Id.* The Petitioner asserts, relying upon prior decisions of this court, *see generally Jesse Haddox v. State*, No. M2003-00415-CCA-R3-PC (Tenn. Crim. App., at Nashville, Nov. 10, 2004); *Jack Jay Shuttle v. State*, No. E2003-00131-CCA-R3-PC, that he is entitled to DNA testing of the bloody clothing because the potential exculpatory DNA results would corroborate his claims of innocence. The Petitioner further asserts that exculpatory results would lend support to the two affidavits filed by Petitioner during previous collateral proceedings, referring to the affidavits of John Edward Williams and Leroy Jones.[4] He contends that the determination of whether a particular case meets the reasonable probability standard is not based on the type of evidence that was used to obtain the conviction, nor on the strength of the State's case. Rather, he contends what is decisive under the reasonable probability standard is the probative value of the evidence sought to be tested or, in other words, the significance that exculpatory DNA test results would have in the case.

The Petitioner asserts that the evidence against him was strictly circumstantial. He asserts that exculpatory DNA results, in addition to the Petitioner's claim of innocence and the affidavits of Jones and Williams, produces a reasonable probability that one or more of the jurors could have had a reasonable doubt of the Petitioner's guilt. Thus, he asserts he has met his burden.

In both *Alley I* and *Alley II,* this court recognized that "[a] 'reasonable probability' of a different result exists when the evidence at issue, in this case potentially favorable DNA results,

---

[4] John Edward Williams stated that, after seeing the Petitioner enter the apartment building, he saw a black male, not Pervis Payne, leave the apartment building. Mr. Williams added that he had seen this unidentified black male with Charisse Christopher on several occasions, some of which involved Christopher and the man arguing. Leroy Jones stated that Charles Jones and Danny Haley were cocaine dealers. They used Charisse Christopher to sell cocaine out of her apartment. Leroy Jones related that he overheard Haley stating that Christopher had to be killed. The next week Charisse Christopher was killed.

undermines confidence in the outcome of the prosecution." *Sedley Alley v. State*, No. W2006-01179-CCA-R3-PD (Tenn. Crim. App., at Jackson, Jun. 22, 2006), *perm. to appeal denied,* (Tenn. Jun. 27, 2006); *Sedley Alley v. State*, No. W2004-01204-CCA-R3-PD; *see, e.g., State v. Workman*, 111 S.W.3d 10, 18 (Tenn. Crim. App. 2002). Notwithstanding its consideration of the "potentially favorable" DNA testing results, the reviewing court cannot ignore the existing evidence. *See Alley*, No. W2004-01204-CCA-R3-PD.

The Petitioner requests that the items of his clothing and the bloody clothing of the victims be tested in order to exonerate him and to determine whether a third party was the assailant. He contends that exculpatory results can include the presence of third party DNA and/or the absence of his DNA on the clothing. This court has previously stated that post-conviction DNA testing is a method of establishing the innocence of the petitioner and "not to create conjecture or speculation that the act may have possibly been perpetrated by a phantom defendant." *Sedley Alley v. State*, No. W2006-01179-CCA-R3-PD (citing *Sedley Alley v. State*, No. W2004-01204-CCA-R3-PD).

For purposes of the Act, we presume that DNA testing will reveal exculpatory evidence; specifically, we will presume that the clothing of the victims will not reveal the presence of DNA from the Petitioner and that it will reveal the DNA of a third party. However, this court cannot ignore the evidence of the Petitioner's guilt. The evidence introduced at trial indicates that:

> 1. The Petitioner's baseball cap was found on Lacie Christopher's forearm - her hand and forearm sticking through the opening between the adjustment strap and the cap material. *See Payne*, 791 S.W.2d at 13. No explanation was provided as to how the cap came to be located on Lacie's person.

> 2. Charisse Christopher's body was found on the kitchen floor on her back, her legs fully extended. The right side of her upper body was against the wall, and the outside of her right leg was almost against the back door. Her shorts were pushed up on her legs and a used tampon was found beside her lifeless body. *See Pervis Tyrone Payne v. State*, No. 02C01-9703-CR-00131.

> 3. The medical examiner testified that the wounds inflicted upon Lacie Christopher "would have been rapidly fatal." *See Payne*, 791 S.W.2d at 12. The Petitioner testified that as he approached the apartment, he heard the baby crying.

14

4.   Nancy Wilson heard footsteps leading into the bathroom and heard water running in the sink.  The Petitioner denied going to the bathroom.

5.   Our supreme court noted that "[t]he testimony of Laura Picard and Nancy Wilson, the time of Mrs. Wilson's call to the police and Officer Owens' arrival virtually forecloses the possibility that an unidentified intruder committed these murders and disappeared out the front door before the [Petitioner] entered the apartment." *Payne,* 791 S.W.2d at 15.

6.   This court noted "The [Petitioner's] own testimony was damning.  Incredibly, he testified at trial that he went into the apartment and found the Christophers.  In trying to explain how he had so much blood on him, the [Petitioner] testified that it happened when he pulled the knife out of Ms. Christopher's neck.  As Ms. Christopher reached for him, she fell and hit the kitchen wall, splattering him with blood.  This, of course, was after Ms. Christopher had been stabbed forty-one times.  The [Petitioner] fled the scene, assaulting a police officer as he ran, and was later found hiding in a friend's attic.  The [Petitioner's] baseball cap was found intertwined in Lacie's arm, although he did not recall his hat falling off.  Moreover, we note that the time frame of the murders virtually precludes any person other than the [Petitioner] from committing these crimes.  Witnesses at trial testified that, after they heard screaming from the upstairs apartment, they saw no one go up or down the stairs.  The resident manager, Wilson, testified that, after the screaming stopped, she heard a person walk into the bathroom and heard water running.  She then heard a person walk across the floor, slam the door shut and then run down the steps.  The police were on the scene at that point in time with the first officer observing the [Petitioner] as he ran down the stairs covered in blood.  There is no question as to the confidence in the jury's verdict."  *Pervis Tyrone Payne v. State*, No. 02C01-9703-CR-00131.

7.   During the State's cross-examination, the Petitioner made the following admission:

> Q. Can you explain why there's bloodstains on your
> left leg?

A. Left leg?

Q. Yes, sir.

A. Evidently it probably came - had to come from when she - when she hit the wall. When she reached up and grabbed me.

Q. When she hit the wall?

A. When she - when she hit - when she hit when I got ready to run up - when I got ready to vomit.

Q. When she hit the wall she got blood on you?

A. When she splashed. It was blood - a lot of blood on the floor.

Q. She got blood on you when she hit the wall. Is that what you said?

A. She hit against the wall when she fell back.

Q. Is that what you said, sir, that she got blood on you when she hit the wall?

A. I didn't say she got blood on me when she hit the wall.

Q. Isn't that what you said just a moment ago, sir?

A. That ain't - that's not what I said.


## 1. Review of Lower Court's Findings

### a. Presence of Unknown Party's DNA

The post-conviction court concluded that "[g]iven the circumstances of the victims' murder and the evidence presented at trial, this court can not agree with petitioner's contentions." The court concluded that "the presence of skin, hair or some other substance containing DNA, other than blood, even if it were found to belong to an unknown third party would not prove

16

exculpatory as such sample could have been left at the apartment at a time prior to the murders." The court acknowledged that a stronger case would be presented if blood evidence belonging to a third party was found on the victims' clothing. However, even in this event, this would not create a reasonable probability that the Petitioner would not have been prosecuted or convicted. The post-conviction court continued, noting that, as both the supreme court and this court have acknowledged, the evidence against the Petitioner rendered it virtually impossible for any person other than the Petitioner to have committed the crimes. The post-conviction court noted that it "can not say that the presence of some unknown quantity of some unknown person's blood deposited at some unknown time on either the victims' or the petitioner's clothing would have sufficiently corroborated petitioner's claims to the point that the jury would have accredited his version of events and rendered an acquittal." The post-conviction court added that "this court can not say that, even if exculpatory results were produced, the confidence in the outcome of the prosecution of petitioner's case would be undermined."

With consideration of the proof introduced at trial, this court, as found by the post-conviction court, cannot conclude that the presence of an unknown person's DNA on the victims' or Petitioner's clothing would have resulted in the State foregoing prosecution and/or resulting in the Petitioner not being convicted. Moreover, this court, as found by the post-conviction court, cannot conclude that the presence of an unknown party's DNA on the victims' clothing or the Petitioner's clothing would have rendered the Petitioner's verdict or sentence more favorable. Considering the severity and number of wounds inflicted upon the victims, it is more likely than not, that the blood belonged to Ms. Christopher, Lacie, or Nicholas. Additionally, even should the samples contain DNA evidence belonging neither to the Petitioner nor any of the victims, we cannot conclude that such evidence, in light of the totality of all evidence, would have precluded prosecution or conviction. Accordingly, this court concludes that the post-conviction court has not abused its discretion in denying post-conviction DNA analysis on the victims' clothing and the Petitioner's clothing.

### b. Lack of Presence of the Petitioner's DNA

The Petitioner additionally argues that, if testing revealed the absence of his blood DNA on the victims' clothing, then such fact would lead to a reasonable probability that he would not have been convicted. The post-conviction court disagreed, noting that although there was evidence presented that the Petitioner had scratches on his chest, there was no proof that the Petitioner's injuries were so severe that they would have necessarily left blood evidence on the victims' clothing. The post-conviction court concluded that "even if DNA testing indicated petitioner did not leave blood on the victims' clothing, there is not a reasonable probability that the State would have forgone prosecution." The court continued, saying that "[g]iven the strength of the proof against petitioner, it is almost certain they would have continued to prosecute petitioner for the murders." The post-conviction court added that the absence of the Petitioner's blood from the victims' clothing does not corroborate his claim of innocence; rather,

it just leads to the conclusion that the Petitioner did not leave any blood deposits on the victims' clothing during the altercation.

We agree with the conclusions reached by the post-conviction court. We cannot conclude that the absence of the Petitioner's blood on the victims' clothing would have resulted in the State foregoing prosecution and/or resulting in the Petitioner not being convicted. Moreover, this court, as found by the post-conviction court, cannot conclude that the absence of the Petitioner's blood on the victims' clothing would have rendered the Petitioner's verdict or sentence more favorable. Accordingly, this court concludes that the post-conviction court has not abused its discretion in denying post-conviction DNA analysis on the victims' clothing and the Petitioner's clothing.

## Conclusion

Upon our review of the record before us, including the Petitioner's brief and the State's response, we conclude that the post-conviction court properly considered all of the evidence before it. Moreover, we conclude that the record supports the post-conviction court's conclusions that the Petitioner had failed to establish that (1) a reasonable probability exists that the Petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis and (2) a reasonable probability exists that analysis of the evidence will produce DNA results which would have rendered the Petitioner's verdict or sentence more favorable if the results had been available at the proceedings leading to the judgment of conviction. *See* T.C.A. §§ 40-30-304(1), -305(1). Accordingly, the post-conviction court did not err by denying the Petitioner's request for DNA analysis.

The judgment of the post-conviction court is affirmed.

_____
NORMA McGEE OGLE, JUDGE

18